# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

| | |
|---|---|
| **INTERNATIONAL PAPER COMPANY, et al.,** : : : **Plaintiffs,** : : **v.** : : **REXAM, INC., et al.,** : : **Defendants.** : : _____ : | Civil Action No. 11-6494 (JAP) **OPINION AND ORDER** |

This matter comes before the Court on Defendants/Counterclaimants Rexam Inc. ("Rexam") and Image Products Group LLC's ("Image Products") (collectively, "Defendants") Motion to Compel Discovery and for Sanctions [dkt. no. 37]. Plaintiffs International Paper Company ("IP") and Georgia-Pacific Consumer Products LP ("GP") (collectively, "Plaintiffs") have opposed Defendants' Motion [dkt. nos. 40, 41, 42]. The Court has reviewed the submissions of the Parties and heard oral argument. For the reasons set forth on the record and below, Defendants' Motion is **GRANTED**, in part, and **DENIED**, in part.

## I. INTRODUCTION

The issue presented in this Motion is whether extrinsic evidence of past conduct (by the Parties' corporate predecessors) is discoverable.

### A. In General

This litigation concerns liability for costs incurred to investigate and remediate waste material at the Crown Vantage Landfill ("the Landfill"). See generally Amd. Compl [dkt. no. 22]. The Landfill, now inactive, was operated by the Riegel Paper Corporation ("Old Riegel") beginning in the 1930s. Id. Pursuant to a 1971 Agreement and Plan of Reorganization ("the 1971 Agreement"), Old Regal allocated its assets and liabilities between two groups, the Paper Group

and the Packaging Group. Through a series of mergers and acquisitions, Plaintiffs are the successors in interest to the Paper Group and Defendants are the successors in interest to the Packaging Group.

The central issue in the case is whether, and to what extent, the 1971 Agreement allocated liability among the corporate predecessors of Plaintiffs and Defendants. Defendants claim the intent of the 1971 Agreement was to allocate 100% of the Landfill liabilities to the Paper Group (and, thus, to Plaintiffs). According to Defendants, Plaintiffs' subsequent conduct supports this position. Plaintiffs, on the other hand, argue that the 1971 Agreement unambiguously provides for shared liabilities.[1]

### B. Events Leading up to this Motion

The Court conducted an initial Scheduling Conference pursuant to FED. R. CIV. P. 16 on July 24, 2012. At that Conference, the Court and the Parties agreed to conduct limited discovery with regard to the 1971 Agreement. This course of action was memorialized in the Court's Scheduling Order [dkt. no. 32]. Paragraph 3 of that Order reads:

> Initially the Parties will *conduct discovery as to the information and evidence related to the Parties' negotiation and execution of the agreement* which is the subject of this action *as well as the Parties' course of dealing and industry custom*. Such discovery must be completed by February 1, 2013.

Id. (emphasis added). As will become clear, the Parties take very different positions as to the meaning of this provision and the scope of inquiry at this stage of the proceedings.

---

[1] According to Plaintiffs, the liabilities are allocated between the Paper and Packaging Groups in two ways. They are either explicitly allocated to one Group in the 1971 Agreement or they are implicitly attributable to one Group by virtue of its association with the business and/or product lines of that group. To the extent any liabilities remain, Plaintiffs claim, they are to be shared by the Parties.

Following the Scheduling Conference, Defendants served Plaintiffs with their First Set of Interrogatories, Requests for Production of Documents, and Rule 30(b)(6) Notices. Defendants also served Requests for Admissions.

Plaintiffs responded to nine of 23 Interrogatories, 14 of 76 Document Requests and 13 of 211 Requests for Admissions. Plaintiffs specifically objected to any request pertaining to conduct subsequent to the execution of the 1971 Agreement as being outside the permissible scope of inquiry at this stage of the litigation. Plaintiffs also objected to the remaining requests as overly broad, unduly burdensome and/or irrelevant.

On December 7, 2012, Defendants wrote to the Court outlining their position with regard to the alleged deficiencies in Plaintiffs' responses. Plaintiffs responded in a letter to the Court dated December 13, 2012.

During a telephone conference on December 20, 2012, the Court directed the Parties to meet and confer in an attempt to work out their differences. Defendants were further directed to file a motion to compel by January 11, 2013 in the event the meet and confer was unsuccessful. Due to a number of factors, the meet and confer was not successful. This Motion followed.

### III. MOTION TO COMPEL

Defendants seek substantive responses to their written discovery requests. Defendants' discovery requests specifically identify three instances of post-1971 Agreement conduct which, they claim, support their position that Plaintiffs assumed 100% of the Landfill liabilities: (1) GP predecessor Jones River Corporation's ("JRC") communications with New Jersey Department of Environmental Protection ("NJDEP") in the mid-1990s regarding waste at the Landfill; (2) GP predecessor Crown Paper's ("CP") 2001 Bankruptcy motion; and (3) a 2007 Southern District of New York ("SDNY") litigation between (now-Plaintiffs) GP and IP. Although these instances

are specifically referenced, they are not meant to limit Defendants' requests. Instead, they are meant to be representative of a larger pattern or course of conduct by Plaintiffs.

Plaintiffs claim Defendants' discovery requests exceed the scope of discovery as established by the Court's Scheduling Order and Third Circuit precedent. Specifically, Plaintiffs claim Defendants' requests, inasmuch as they relate to extrinsic evidence, do not fit within the definition for either "course of performance" or "course of dealing."[2] Therefore, according to Plaintiffs, any request for information regarding unilateral, post-1971 Agreement conduct is not relevant to interpretation of the 1971 Agreement. To the extent Plaintiffs' objections regarding "course of performance" conduct are overruled, they further contend the discovery sought is overly broad and unduly burdensome.

A.  **Legal Standards**

1.  *Rule 26*

Of course, the scope of discovery in federal litigation is broad. See FED. R. CIV. P. 26(b)(1). Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense. Id. Information sought by the parties need not be admissible at trial if it is "reasonably calculated" to lead to discovery of admissible evidence. Id.

The precise boundaries of the Rule 26 relevance standard depend upon the context of each particular action, and the determination of relevance is within the discretion of the District Court. See Barnes Found. v. Twp. of Lower Merion, 1996 WL 653114, at *1 (E.D. Pa. Nov. 1, 1996). Importantly, "courts have construed this rule liberally, creating a broad vista for

---

[2] The Court's Order specifies "course of dealing." See supra, p. 2. Course of dealing is separate and distinct from course of performance. While the former focuses on the (generally prior) interaction between two parties with respect to each other, Restatement (Second) of Contracts § 223, the latter refers to the parties' execution of their obligations under a given contract, id. at § 202. This distinction notwithstanding, Plaintiffs claim the information fails even the broader definition of course of performance.

4

discovery." Takacs v. Union County, 2009 WL 3048471, at *1 (D.N.J. Sept. 23 2009) (citing Tele-Radio Sys. Ltd. v. DeForest Elecs., Inc., 92 F.R.D. 371, 375 (D.N.J. 1981)); see also Oppenheimer Fund, Inc. v. Sanders, 437 U.S. 340, 351 (1978); Evans v. Employee Benefit Plan, 2006 WL 1644818, at *4 (D.N.J. Jun. 6, 2006). Thus, the relevancy standard is satisfied, and discovery requests should be granted, if there is any possibility that the information sought may be relevant to the general subject matter of the action. Oppenheimer, 437 U.S. 340, 351. "However, the burden remains on the party seeking discovery to 'show that the information sought is relevant to the subject matter of the action and may lead to admissible evidence.'" Takacs, 2009 WL 304847, at *1 (citation omitted).

        2.    *Contract Interpretation*

"In construing a contract, a court's paramount consideration is the intent of the parties." Mellon Bank, N.A. v. Aetna Bus. Credit, Inc., 619 F.2d 1001, 1009 (3d Cir. 1980) (citation omitted). The strongest evidence of the parties' intent is the words used in their written contract. Id. If, however, after assessing "the contract language, the meanings suggested by counsel, and the extrinsic evidence offered in support of each interpretation," there remains an "objective indicia" that the contract terms are ambiguous, the Court must then consider extrinsic evidence to clarify the contract's meaning. In re New Valley Corp., 89 F.3d 143, 150 (3d Cir. 1996) (citations omitted).

    **B.**    **Discussion**

        1.    *Relevance*

Plaintiffs argue that the "only evidence of subsequent conduct relevant to contract interpretation is regular, repeated, affirmative conduct engaged in and acquiesced to by both parties to the contract." Pl.'s Opp. Br. at 11 (noting that Defendants' proffered example of

unilateral subsequent conduct do not fit the definition of "course of performance"). While this may be an accurate statement on the *admissibility* of course of performance evidence, Twp. of White v. Castle Ridge Dev. Corp., 419 N.J. Super. 68, 77 (App. Div. 2011) (citing Restatement (Second) of Contracts § 202(4) (1979)), it is irrelevant—or, at very least, premature—to a Rule 26 analysis. Simply put, Plaintiffs' argument improperly conflates admissibility with relevance. See Nestle Foods Corp. v. Aetna Cas. & Sur. Co., 135 F.R.D. 101, 104 (D.N.J. 1990) ("[I]t is important to distinguish the right to obtain information by discovery from the right to use it at trial."); see also Scouler v. Craig, 116 F.R.D. 494, 496 (D.N.J. 1987) (whether certain documents "are relevant must be viewed in light of the allegations of the complaint, not as to evidentiary admissibility"). In this case, Defendants have made an adequate showing that the evidence sought is discoverable.

As a threshold matter, there has been no determination (nor will there be at this stage) that the 1971 Agreement is ambiguous. Indeed, the admissibly of extrinsic evidence remains an open issue to be decided by the trial court. See In re New Valley Corp., 89 F.3d 143, 149 (3d Cir. 1996) (whether a document is ambiguous presents a question of law properly resolved by this court). Therefore, in order for Defendants to evaluate whether there is a viable claim of ambiguity, they must first be allowed to explore the cited instances of extrinsic conduct. See IBEW Local Union No. 102 v. Star-Lo Elec., Inc., 444 F. App'x 603, 608 (3d Cir. 2011) (vacating district court's grant of summary judgment when it declined to consider extrinsic evidence in making an ambiguity determination). To be sure, Plaintiffs' opposition "begs the relevancy question: how can [Defendants] be denied documents on the grounds of inadmissibility before a court has ruled on the underlying issues?" Nestle, 135 F.R.D. at 105.

Under New Jersey and Third Circuit law, extrinsic evidence of the type sought here may also be admitted to aid in interpretation of an ambiguous agreement. Compare Teamsters Indus. Employees Welfare Fund v. Rolls-Royce Motor Cars, Inc., 989 F.2d 132, 137 (3d Cir. 1993) (parties' course of conduct under ambiguous agreement deemed controlling) with Quick v. N.L.R.B., 245 F.3d 231, 247 (3d Cir. 2001) (action on single occasion would be inadmissible as course of performance evidence) (dicta). Importantly, however, such an inquiry would only be reached following a determination of ambiguity. See, e.g., Quick, 245 F.3d at 248 (declining to consider extrinsic evidence when contract terms were unambiguous). And in any case, the applicable standard would be evidentiary admissibility, not discoverability under Rule 26.

In PSEG v. PECO, the District Court addressed this distinction between admissibility and discoverability in an analogous context. 130 F.R.D. 543 (D.N.J. 1990). There, plaintiff PSEG alleged that defendant PECO failed to perform its contractual management duties as the operator of a power station co-owned by PSEG and PECO. Id. at 544. As a result of PECO's mismanagement, the power station was shut down. Id. PSEG then sought to recover losses from PECO. Id. In defense, PECO claimed that all co-owners "mutually agreed" to share in all losses, regardless of fault. Id. at 545. To support this position, PECO pointed to PSEG's actions under an analogous contract between PSEG and PECO. Id. Under the analogous contract, PSEG allowed other co-owners to share losses arising out of PSEG's own alleged mismanagement. Id.

PECO served PSEG with interrogatories which sought evidence of PSEG's actions under the analogous contract. Like Plaintiffs here, PSEG resisted production, arguing that "mutual *knowledge* and *acquiescence* in the repeated course of performance must be shown before the

7

parties' conduct can be employed in interpreting their conduct." Id. at 549.³ Mutuality of knowledge, as understood by PSEG, would have required PECO to show that it knew PSEG engaged in misconduct (by mismanaging the power station) but nevertheless acquiesced (by sharing the costs with PSEG). Id.

The District Court rejected PSEG's argument. It explained, "[p]erfect mutuality of knowledge and assent may be impossible, and should not necessarily be required, where, as here, the other party is alleged to have withheld evidence of its conduct . . . ." Id. at 550. In such cases, the Court noted, the evidence may also be admissible under a theory of interpretation against interest. Id. (citing 3 A. Corbin, *Corbin on Contracts* § 558, at 256 (1960)).⁴ Thus, discovery "clearly related" to PSEG's knowledge and intent was allowed as a "necessary step" toward the gathering of admissible evidence of *either* the parties' course of performance *or* PSEG's interpretation against interest. Id. (further nothing that, even if the evidentiary rule found in § 202(4) requires "contemporaneous mutuality of knowledge, discovery should not be precluded so long as the discovery appears reasonably calculated to lead to the discovery of admissible evidence under Rule 26"). A determination as to the actual admissibility of the proffered evidence was left until trial. Id.

---

³ The PSEG plaintiffs therefore attempted to invoke § 202(4) for the proposition that unilateral conduct, without mutuality of knowledge, would not constitute course of performance evidence.
⁴ The cited provision provides:

> The practical interpretation of the contract by one party, evidenced by his words or acts, can be used against him on behalf of the other party, even though that other party had no knowledge of those words or acts when they occurred and did not concur in them. In the litigation that has ensued, one who is maintaining the same interpretation that is evidenced by the other party's earlier words, and acts, can introduce them to support his contention.

3 A. Corbin, *Corbin on Contracts* § 558, at 256 (1960). The theory of 'interpretation against interest' is also found in comment (g) of the Restatement (Second) of Contracts § 202(4).

Here, like in PSEG, the Court need not resolve at this stage whether the proffered instances of extrinsic conduct were isolated and unilateral. To do so would require a premature analysis of the admissibility of the discovery sought. Instead, it is enough that Defendants have made a sufficient showing that additional discovery with regard to each cited instance would likely lead to admissible evidence.

First, with regard to JRC, Defendants claim they have uncovered evidence which shows that JRC (1) affirmatively took sole responsibility and solely incurred costs for Landfill liabilities, and (2) affirmatively chose not to notify Defendants as required by the 1971 Agreement.[5] If true, Defendants claim, Plaintiffs' actions demonstrate their assumption of 100% of the Landfill liabilities.

Plaintiffs claim Defendants' argument "fails because the James River evidence is a single instance of a unilateral decision not to invoke a contract right." Pl.'s Opp. Br. at 18. Plaintiffs' argument is unpersuasive. By the very language of the contract—which Plaintiffs steadfastly maintain is unambiguous—notice to Defendants was required. It is only "common sense," PSEG, 130 F.R.D. at 550, then, that Plaintiffs should not be able to use their own unilateral decision (to disregard the contract terms) as a shield against Defendants' discovery requests. See id.

Further, unilateral conduct alone does not mean a given action should not be considered as a matter of contract interpretation. PSEG, 130 F.R.D. at 550 (recognizing unilateral conduct may be admissible as interpretation against interest). Instead, as was the case in PSEG, such action may also be evidence against Plaintiffs that they had knowledge or reason to know of

---

[5] The 1971 Agreement provides: "if Riegel or Federal, subsequent to the Merger Date, shall receive notice of any liability of the Packaging Group, it shall promptly notify Packaging thereof." 1971 Agreement at § 19.5.

9

Defendants' meaning (i.e., Plaintiffs shared Defendants' view that they had retained 100% of the Landfill liabilities). Thus, under Rule 26, the JRC activity is relevant to the interpretation of the 1971 Agreement, including Defendants' claim and defense that the Landfill liabilities were transferred to Plaintiffs.

Second, CP's reference to the Landfill liabilities in its Bankruptcy proceeding is also relevant under Rule 26. There, CP sought to discharge its liabilities with respect to the Landfill. Decl. of M. Hensely at Ex. C (CP's Motion to Abandon). Plaintiffs claim this language was intended to refer only to the liabilities which were actually retained by CP. It was not, Plaintiffs maintain, an admission that CP had retained more liabilities than otherwise provided for in the 1971 Agreement. Plaintiffs also claim Defendants cannot show that CP was actually a GP corporate predecessor.

Plaintiffs' arguments with regard to the CP Bankruptcy are also unavailing. Defendants should be entitled to discover exactly what liabilities CP thought (and communicated) it had in connection with the Bankruptcy proceeding. To the extent GP claims CP was not a corporate predecessor, it should be required to demonstrate as much. Indeed, Defendants' Interrogatory No. 18, which was objected to and unanswered, asks Plaintiffs to identify "all agreements and/or transactions that you contend support the allegations . . . that 'through a series of transactions, IP and GP are successors to entities that had ownership interest in the [Landfill] and that succeeded to the liabilities of the Paper Group . . . .'" Decl. of M. Hensley at Ex.'s T, U.

Finally, the 2007 SDNY litigation is also relevant to interpretation of the 1971 Agreement under Rule 26. That litigation revolved around a second contract, the 1972 Agreement. The 1972 Agreement allocated the Paper Group's liabilities, as retained by the 1971 Agreement, to Federal (an IP predecessor) and New Regal (a GP predecessor). In 2007, GP filed

a Complaint against IP seeking a declaratory judgment that Federal, and not New Regal, retained 100% of the Landfill liabilities from the 1972 Agreement.

Like the JRC action and the CP Bankruptcy, Plaintiffs claim the SDNY action is not relevant because it involved only those liabilities actually retained as a result of the 1971 Agreement (and, therefore, only Plaintiffs' unilateral actions with respect to its own liabilities). However, what Federal and New Regal, and ultimately IP and GP, thought they retained as a result of the 1971 Agreement goes to the very essence of the dispute. To assume these large, sophisticated parties would not have addressed this issue in connection with the SDNY litigation is difficult to accept. The veracity of Plaintiffs' claim to the contrary, however, need not be evaluated at this time. It is enough that the discovery sought be reasonably calculated to lead to discovery of admissible evidence. In this case it is.

In conclusion, the Court believes each instance of extrinsic conduct cited by Defendants is, under Rule 26, relevant to interpretation of the 1971 Agreement. Given this determination, Defendants should also be permitted to explore other instances of extrinsic conduct to support their claims. Further, because the Court has yet to make any determination regarding ambiguity, Plaintiffs' objections on account of admissibility are premature. See PECO, 130 F.R.D. at 550 ("Whether the information obtained in discovery actually results in admissible evidence of the parties' course of performance or of one party's prior interpretation against interest remains to be determined at or before the trial."). For now, it is sufficient that discovery clearly related to Plaintiffs' knowledge and belief regarding which liabilities were retained as a result of the 1971 Agreement be able to proceed "as a necessary step toward the gathering of admissible evidence . . . ." Id. This conclusion notwithstanding, Plaintiffs' objections based on undue burden have some merit.

## 2.    *Proportionality*

"Although the scope of discovery under the Federal Rules is unquestionably broad, this right is not unlimited and may be circumscribed." Bayer AG v. Betachem, Inc., 173 F.3d 188, 191 (3d Cir. 1999) (citations omitted). When the burden of a discovery request is likely to be outweighed by its benefit, the Court must limit discovery of otherwise relevant information. FED. R. CIV. P. 26(b)(2)(C)(iii). In making this burden-benefit determination, courts must weigh "the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the action, and the importance of the discovery in resolving the issues." Id. "The purpose of this rule of proportionality is to guard against redundant or disproportionate discovery by giving the court authority to reduce the amount of discovery that may be directed to matters that are otherwise proper subjects of inquiry." Takacs, 2009 WL 3048471, at *1 (citing Bowers v. NCAA, 2008 WL 1757929, at *4 (D.N.J. 2008)).

Here, as discussed above, Defendants' discovery requests that go to extrinsic evidence are relevant under a Rule 26 analysis. And discovery of such extrinsic evidence should not be limited to the cited instances only. Plaintiffs' blanket objections to post-1971 Agreement conduct (i.e., extrinsic, course of performance evidence) are, as a result, improper. Information related to pre-1971 Agreement information and conduct, although not addressed by the Parties' briefs, is also clearly related to the instant dispute.

Defendants' requests, however, are not as "meticulously designed" to "elicit specific information," Def.'s Reply Br. at 11, as they would have the Court believe. For example, Interrogatory Nos. 7, 8 and 9 ask for the entire operational history of the Landfill from 1927 to present. Decl. of M. Hensley at Ex.'s T, U. Other Interrogatories, such as Nos. 11, 12 and 16, seek information relating to landfills other than the Crown Vantage Landfill. See id. at Ex. T, U;

id. at Ex. W (Document Requests 50, 51). And Defendants' Document Demand No. 61 asks for the "entire litigation file" of the SDNY action. Id. at Ex. W.

While, on some level, these requests undeniably seek relevant information, their breadth is sweeping—especially given the current scope of inquiry at this stage. Defendants, therefore, are directed to refine and resubmit their discovery requests. In so doing, Defendants should be mindful of the Court's concerns regarding relevance, scope and proportionality.

### III. SANCTIONS

A court must issue sanctions, pursuant to Rule 26 or Rule 37, for noncompliance with a scheduling order or for failure to cooperate in discovery unless noncompliance was substantially justified or other circumstances make an award of expenses unjust. FED R. CIV. P. 26(f)(2); FED R. CIV. P. 37(b)(2)(C). "The rule's purposes are to: (1) penalize the culpable party or attorney; (2) deter others from engaging in similar conduct; (3) compensate the court and other parties for the expense caused by the abusive conduct; and (4) compel discovery and disclosure." Wachtel v. Health Net, Inc., 239 F.R.D. 81, 99 (D.N.J. 2006) (citing Nat'l Hockey League v. Metro. Hockey Club, Inc., 427 U.S. 639, 643 (1976); Carlucci v. Piper Aircraft Corp., 775 F.2d 1440, 1453 (11th Cir.1985)).

Sanctions are inappropriate at this time. Although unavailing, Plaintiffs' arguments are not completely without merit. Instead, Plaintiffs' position appears to be made in good faith and based on a legitimate dispute regarding the scope of discovery. The Parties are now directed to meet and confer regarding Defendants' outstanding discovery requests. This meet and confer process shall be informed by the Court's discussion of relevance and scope herein. The Parties are further advised that any future motion practice which requires the Court to revisit any of the issues addressed by this Opinion may result in the imposition of sanctions.

**IV.     CONCLUSION AND ORDER**

For the reasons set forth on the record and above,

**IT IS** on this 17th day of June, 2013,

**ORDERED** that Defendants' Motion to Compel Discovery and for Sanctions [dkt. no. 37] is **GRANTED**, in part, and **DENIED**, in part, as set forth above; and it is further

**ORDERED** that the Parties are directed to meet and confer, as required by the Local and Federal Rules, regarding Defendants' outstanding discovery requests.

A telephone conference is scheduled for June 24, 2013 at 3:30 PM. Plaintiffs' counsel must initiate this call.

> **s/ Douglas E. Arpert**
> **DOUGLAS E. ARPERT, U.S.M.J.**